Rico CAMPBELL, a minor by and
through Barbara Campbell, his
mother, Plaintiff,

v.

LIBERTY FINANCIAL PLANNING,
INC., a corporation, Defendant.

Civ. No. 75-0-181.

United States District Court,
D. Nebraska.

Dec. 10, 1976.

Robert V. Broom, Gary R. Batenhorst, Legal Aid Society of Omaha, Council Bluffs, Inc., Omaha, Neb., for plaintiff.

Robert P. Miller, Omaha, Neb., for defendant.

## MEMORANDUM

ROBINSON, Senior District Judge.

This is an action brought pursuant to the Truth-In-Lending provisions of the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, and the regulations adopted pursuant thereto published at 12 CFR 226 (commonly referred to as Regulation Z). Jurisdiction is clearly present under 15 U.S.C. § 1640(e). The matter was tried to the Court without a jury, and this Memorandum shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

I

On March 6, 1975 Rico Campbell, plaintiff herein, went to the Omaha office of the defendant Liberty Financial Planning, Inc. [hereinafter Liberty] to arrange financing for the purchase of an automobile. Liberty was originally contacted by the salesman from whom plaintiff purchased the car. Plaintiff's mother, Barbara Campbell, had an outstanding account with Liberty which had been discharged in bankruptcy in November, 1974. Liberty, however, retained a security interest in the Kirby vacuum cleaner which had been the basis of Mrs. Campbell's debt. Upon arrival at Liberty's office, plaintiff conferred with Jack Preston, Liberty's manager, who told him that the loan for the automobile could not be approved unless plaintiff paid $100 on his mother's account, which amount Preston felt represented the probable fair value of

the vacuum cleaner. Plaintiff had previously that day been told by an employee of Liberty on the telephone of this precondition to consideration of his loan. Plaintiff claimed at trial that Preston at this time told him that the loan for the automobile would be extended if the $100 were paid; Preston, on the other hand, claimed that he told plaintiff only that his loan application would be *considered* if the $100 were paid. In any event, plaintiff agreed to pay the demanded $100 and was given a receipt by Preston which stated that the payment was in full settlement of the account of Barbara Campbell [plaintiff's Exhibit 1]. Plaintiff then executed a note to Liberty with a principal amount, including insurance charges, of $737.28 [plaintiff's Exhibit 3]. This amount indisputably reflected the $600 which plaintiff needed to finance the automobile and the $100 which he paid to settle his mother's account. The disclosure statement given to plaintiff by Liberty at this time [plaintiff's Exhibit 2] showed the amount financed as $737.28 and the finance charge as $222.72. The $100 payment was not individually listed on the document.

Plaintiff subsequently brought this action against Liberty alleging that the failure to disclose the $100 payment as part of the finance charge constituted a violation of the Truth-In-Lending Act. Plaintiff further claims that because the $222.72 finance charge imposed on the loan was the maximum interest permissible under Nebraska Statute, the additional $100 charge made the transaction usurious and therefore created an action in his favor under Neb.Rev. Stat. § 45–137(5) (Reissue 1974), which this Court can consider in the exercise of its pendent jurisdiction.

## II

15 U.S.C. § 1605(a) provides that the

"amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by

the creditor as an incident to the extension of credit. . . ."

It thus becomes obvious that the initial inquiry must be whether the $100 which plaintiff paid to settle his mother's account was "an incident to the extension of credit." In making this determination, the Court notes the finding of Congress that

economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.

15 U.S.C. § 1601.

The Court of Appeals for this Circuit has stated that the purpose of the Act is to require creditors to disclose the true cost of credit, *Joseph v. Norman's Health Club, Inc.,* 532 F.2d 86 (8th Cir. 1976), and it has been stated many times that the Act requires a liberal construction in order to effectuate the intent of Congress. *See, e. g., Eby Realty v. Reb Realty,* 495 F.2d 646 (9th Cir. 1974); *Scott v. Liberty Finance Co.,* 380 F.Supp. 475 (D.Neb.1974).

The Court has been unable to find precise guidance in the case law of Truth-In-Lending actions with respect to the instant factual situation. However, it is easily seen that a broad array of extraneous charges has been found to be within the contemplation of the Act's definition of a finance charge. *See, e. g., Buford v. American Finance Co.,* 333 F.Supp. 1243 (N.D.Ga.1971) (notary fees); *Grubb v. Oliver Enterprises, Inc.,* 358 F.Supp. 970 (N.D.Ga.1972) (loan fees authorized by state statute includible in finance charge); *Meyers v. Clearview Dodge Sales, Inc.,* 384 F.Supp. 722 (E.D.La. 1974) (tag, title, and fees).

The assumption by a borrower of the pre-existing debt of another as a condition

to the extension of credit has been found to be interest applicable to the borrower's loan in a usury context, *Curtiss National Bank of Miami Springs v. Solomon*, 243 So.2d 475 (Fla.App.1971); *Ferdon v. Zarriello Bros., Inc.*, 87 N.J.Super. 124, 208 A.2d 186 (1965), but there does not appear to be a reported case with like facts which was a Truth-In-Lending action.

■ The lack of clear precedent in this area notwithstanding, the Court is required by all of the above to find that the $100 payment by plaintiff on his mother's account was an "incident to the extension of credit." Defendant's manager testified that plaintiff was not assured that his loan would be granted if he paid the $100, but it seems logical that plaintiff would not have so paid it without some measure of confidence that he would get his loan. Regardless of the precise semantical posturing which took place at the time, it is clear that payment of the $100, however voluntary it may have been, was a condition precedent to the extension of the loan by Liberty to Plaintiff. Indeed, the very ease with which the $100 was added to the amount financed undoubtedly had the effect of making its payment more palatable to plaintiff, and it is precisely this type of added cost of credit which the Truth-In-Lending Act is designed to disclose and thereby prevent. .

### III

■ The finding that the $100 payment was properly includible in the finance charge as defined by 15 U.S.C. § 1601 invokes an inquiry into the disclosure requirements of the Act. 15 U.S.C. § 1639(a)(4) requires the disclosure of the finance charge by a creditor making a consumer loan. More directly on the present point,

§ 226.8(e)(1) of Regulation Z requires the disclosure of

[a]ny finance charge paid separately, in cash or otherwise, directly or indirectly to the creditor or with the creditor's knowledge to another person, or withheld by the creditor from the proceeds of the credit extended.

§ 226.8(d)(2) of Regulation Z further requires that any such finance charge shall be disclosed using the term "prepaid finance charge" and shall be excluded from the disclosure section labelled "amount financed."

The Court thus finds that defendant Liberty violated the disclosure requirements imposed upon it as a maker of consumer loans.

### IV

■ The remedy to which plaintiff is entitled in this case due to Liberty's violation of the Act's disclosure requirements is the sum of 1) twice the amount of the finance charge in connection with the transaction (except that it shall not be less than $100 nor greater than $1000) and 2) the costs of the action, together with a reasonable attorney's fee as determined by the Court. 15 U.S.C. § 1640. Twice the amount of the finance charge in this transaction would be $322.72 x 2 or $645.54. The Court will delay the entry of judgment for fifteen (15) days from the date hereof so that plaintiff's counsel may make a showing regarding an attorney's fee.

■ The fact that plaintiff's counsel is employed by a Legal Aid Society does not affect the award of attorney's fees. *Sellers v. Wollman*, 510 F.2d 119, 123 (5th Cir. 1975), and cases cited therein.[1]

---

1. As Chief Judge Urbom observed in another Truth-In-Lending action, "The justness of this decision is open to honest dispute." *Mawhiney v. Keystone Agency*, Civil No. 75–L–91 (D.Neb., filed July 9, 1976). It seems anomalous to penalize Liberty for failing to disclose the $100 "charge" when plaintiff was admittedly fully aware of its existence and purpose. Furthermore, plaintiff was free to procure his loan elsewhere, although it was brought out at

trial that he was a minor at the time of this undertaking. The willingness of Liberty to make the loan to plaintiff without a cosigner, albeit with a condition, probably influenced him to follow through with the transaction.

It is also significant that plaintiff did not accept Liberty's offer to rescind the whole transaction when he returned to their office the next day and demanded that his $100 be returned to him. This of course occurred *after* he

## V

Plaintiff also contends that the exaction by Liberty of the $100 payment as a condition precedent to his loan violated the provisions of the Nebraska Installment Loan Act, Neb.Rev.Stat. § 45–114 *et seq.* (Reissue 1974). The theory is that since plaintiff was already charged the maximum interest allowable under § 45–137(1), the additional $100 charge made the transaction usurious.

 Plaintiff is correct in his assertion that this Court may entertain the related state claim in the exercise of its pendent jurisdiction. The test of a federal court's *power* to hear a state claim is the requirement of a common nucleus of operative facts. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This test is clearly satisfied in the present instance. However, beyond the mere power to hear the state claim, the Court is also imbued with discretion in deciding whether to exercise pendent jurisdiction. The factors which the Court must take into account in this determination include considerations of judicial economy; convenience and fairness to the litigants; the desirability of a federal court avoiding unnecessary decisions of state law; the stage of the proceedings at which the federal claim is disposed of; and the relationship of the non-federal claim to the federal claim. *Gibbs, supra,* at 726–27. The Court is convinced upon an appraisal of these factors that plaintiff's state claim should be decided in the present proceedings.

Although the Supreme Court of Nebraska has never decided the exact point advanced by plaintiff, it has often liberally construed the Installment Loan Act so as to prevent usurious charges from being applied to a credit transaction. For example, in *Lloyd v. Gutgsell,* 175 Neb. 775, 124 N.W.2d 198 (1963), *rehrg. denied,* 176 Neb.

354, 126 N.W.2d 224 (1964), the Nebraska court stated that

> [w]hen we look through the form, can we come to any other conclusion but the one that the difference between the price and what the buyer finally pays is the cost of carrying the balance of the cash price? To put it another way, the charge is for the forbearance to collect the full cash price, or for the use of the money. A rose is still a rose though we may label it a violet. This charge, regardless of its label, is interest.

175 Neb. at 782–783, 124 N.W.2d at 204.

Courts in other jurisdictions have considered factual situations similar to the case at bar in which a borrower assumes the obligation of another person as a condition to the extension of a loan, and many have concluded that the additional requirement constitutes usury as to the borrower's loan *if there is no independent consideration to support the collateral assumption.* See, e. g., *Ferdon v. Zarriello Bros., Inc.,* 87 N.J. Super. 124, 208 A.2d 186, 189 (1965); *Winder National Bank v. Graham,* 38 Ga.App. 552, 144 S.E. 357 (1928). The Restatement of Contracts (1932) states the rule as follows:

> § 528. BARGAIN COLLATERAL TO A LOAN.
>
> A bargain accompanying and collateral to a bargain for a loan of money or for extending the maturity of a pecuniary debt, if providing for only a fair equivalent to the creditor for the consideration that he gives, is not taken into account in computing the creditor's profit, in order to determine whether the bargain for a loan or an extension is usurious, unless his intention is to secure a greater profit for the loan or extension than is allowed by law.

had conferred with his mother about the status of her debt with Liberty.

The Court finds apposite here the sentiment of another brother Judge dissatisfied with the inflexibility of the Truth-In-Lending Act:

The Court's holding in this case is rather harsh on the defendant. If the Court had a

choice, it would not allow recovery in this case.

*Scott v. Liberty Finance Co.,* 380 F.Supp. 475, 480 (D.Neb.1974) (Per Denney, J.). The Court wholeheartedly concurs with this statement in the context of the present action.

*Comment*:

a. The facts that a collateral bargain involves some profit to the lender and that the loan or extension would not have been made without the collateral bargain are not alone enough to make the transaction usurious. The advantage that the creditor derives from the collateral bargain must be greater than would be normally derived therefrom if it were an independent transaction, or his intent must otherwise appear to derive an excessive profit from the loan or extension.

The collateral bargain in the present case must therefore be examined in order to determine whether usury results in plaintiff's loan transaction. It appears to the Court that Liberty gave fair consideration to plaintiff in return for his $100 payment, namely, the forebearance to enforce the security agreement which it retained on the vacuum cleaner. Liberty had instituted a replevin action against Barbara Campbell with respect to this vacuum cleaner in the Municipal Court for the City of Omaha on January 27, 1975 (Doc. F11 No. 4). Plaintiff introduced a certified copy of the official records of this replevin action into evidence [Plaintiff's Exhibit 9], and it appears that no further prosecution of the matter was undertaken by Liberty since February 24, 1975. Liberty in its Answers to plaintiff's Interrogatories (filing No. 5) states that it ceased all efforts to collect the account balance of Barbara Campbell as of March 6, 1975. If Liberty has actually abandoned its claim to the vacuum cleaner on which it retained a security interest after Barbara Campbell's discharge in bankruptcy, it seems only logical to conclude that plaintiff received independent consideration for his payment of $100. Plaintiff objected at trial to Mr. Preston placing a value on the vacuum cleaner when he had never examined it, but Preston did testify that repossessed vacuum cleaners of this type usually bring between seventy-five and one hundred twenty-five dollars. The Court is satisfied that a vacuum cleaner only slightly more than a year old which cost approximately four hundred dollars new would retain a fair market value in the range estimated by Mr. Preston.

■ The previous finding that the $100 charge was incidental to the extension of credit to plaintiff does not control the determination of the state law issue. *Joseph v. Norman's Health Club,* 532 F.2d 86, 93 (8th Cir. 1976). Furthermore, the Court finds that plaintiff has not established by a preponderance of the evidence that Liberty otherwise intended to derive an excessive profit from the loan to plaintiff.

■ The Court has decided that plaintiff's state law claim will be dismissed with prejudice if within fifteen (15) days from the date hereof defendant shows the Court that it has voluntarily dismissed its replevin action against Barbara Campbell and has formally released its security interest in the aforementioned vacuum cleaner. In this event Liberty will have irrefutably established the Court's conclusion that independent consideration was given for plaintiff's $100 payment. If, on the other hand, Liberty declines to make such a showing, the Court will reconsider its findings with respect to this issue.

As previously indicated, judgment will be withheld for fifteen (15) days from the date of this Memorandum so that plaintiff's counsel may make a showing regarding an attorney's fee, and so that Liberty Financial Planning, Inc. may show the Court its evidence of abandonment of interest in the vacuum cleaner.